FRIZZELLE FARMS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6837–70.    Filed March 13, 1974.

*Frank P. Meadows, Jr.,* and *Jeff D. Batts,* for the petitioner.
*Harvey S. Jackson,* for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency of $158,926.26 in the income tax of petitioner for 1968. Several questions were settled prior to trial, and petitioner conceded an alternative issue on brief.[1]

---

[a] At trial petitioner contended that the merger of P. Lorillard Corp. and Loew's Theatres, Inc., was a nontaxable reorganization under sec. 368(a)(1)(A) of the 1954 Code. No mention of this contention was made in petitioner's brief, and we have treated this issue as conceded.

Accordingly, the only issue for decision is whether petitioner may report the gain realized on its exchange of 4,000 shares of Lorillard stock for debentures and stock warrants of Loew's by use of the installment method under section 453.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is Frizzelle Farms, Inc. (hereafter petitioner), a North Carolina corporation which at all relevant times maintained its principal office and place of business in the town of Maury, N.C.

Petitioner maintains its books and records on the cash method of accounting and compiled its 1968 income tax return on the cash method of accounting. For the taxable year 1968 petitioner filed its income tax return, Form 1120, with the director, Southeast Service Center, Chamblee, Ga.

Petitioner was incorporated on or about January 14, 1957, at which time it acquired 4,000 shares of P. Lorillard Corp. (hereafter Lorillard) stock having a basis of $34,010.26. At all times prior to December 11, 1968, petitioner was the beneficial and record owner of the 4,000 shares of Lorillard common stock.

On September 5, 1968, a proposed merger of Loew's Theatres, Inc. (hereafter Loew's), and Lorillard was first publicly announced.

On September 4, 1968, the closing price of Loew's common stock was $95 and the closing price for Lorillard common stock was $58.125.

In 1968 the principal business activity of Loew's was the operation of 14 hotels throughout the United States and the Caribbean and the ownership and operation of 110 motion picture theaters in the United States. In addition, Loew's derived income from its portfolio of marketable securities.

The principal business of Lorillard in 1968 was the manufacture and sale of cigarettes and other tobacco products. In addition, the wholly owned subsidiaries of Lorillard were engaged in the manufacture and sale of pet food and candy.

By letter dated October 22, 1968, the stockholders of Lorillard were informed of a special meeting of Lorillard stockholders to be held on November 26, 1968, "to vote upon an Agreement of Merger of a newly formed subsidiary of Loew's Theatres, Inc. (Loew's) and Lorillard, upon terms such that Lorillard will become a wholly owned subsidiary of Loew's."

The letter was accompanied by a proxy statement which set forth in detail the terms of the proposed merger and certain financial information pertaining respectively to Loew's and Lorillard.

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended.

The closing quotations for the common stock of Loew's and Lorillard on October 18, 1968, were $127.50 and $69.375, respectively.

The proposed merger of Loew's and Lorillard was well publicized in publications such as Barron's, the Commercial and Financial Chronicle, the New York Times, and the Wall Street Journal.

The Lorillard stockholders at the special meeting held on November 26, 1968, approved the merger with Loew's. The merger became effective at the close of business on November 29, 1968.

As a result of the Loew's-Lorillard merger on November 29, 1968, each share of Lorillard common stock automatically became $62 principal amount of Loew's 6⅞-percent subordinated debentures due 1993 and a 12-year warrant to buy 1 share of Loew's common stock, par value $1 per share, at $35 a share during the first 4 years of the warrant, at $37.50 a share during the next 4 years, and at $40 a share during the last 4 years. Each certificate for shares of Lorillard common stock represented and evidenced ownership of Loew's subordinated debentures and warrants.

The stock market reacted very favorably to the proposed Loew's-Lorillard merger and there was continuous and in-volume trading in the securities involved in the merger transaction both before and after the effective date of the merger.

The Loew's common stock was trading on November 29, 1968, for a high-low average price of $157.25 per share. On the same date, the anticipated 3-for-1 split shares of Loew's common stock were trading on a "when issued" basis for a high-low average price of $52.875 per share. The term "when issued" is a contraction of the phrase "when, as and if, issued" which means that settlement of the sales transaction is contingent upon the issuance of the subject securities.

The Loew's warrants were trading on a "when issued" dealing on the over-the-counter market on November 29, 1968, at an average bid-ask price of $29.375. The Loew's warrants were admitted to trading on the American Stock Exchange on December 16, 1968, and continued trading on a "when issued" dealing until January 2, 1969, at which time trading on a "regular basis" or "regular way" commenced.

For the period November 26, 1968, through November 29, 1968, there were actual purchase and sale transactions in the over-the-counter market of Loew's warrants on a "when issued" dealing as follows:

| Date | Reporting broker | Share volume | Low price | High price |
|------|------------------|-------------|-----------|-----------|
| Nov. 26 | Goldman Sachs & Co., New York | 24,300 | $26½ | $29 |
| | L. F. Rothschild & Co., New York | 9,100 | 27 | 30 |
| Nov. 27 | Goldman Sachs & Co., New York | 45,460 | 29½ | 30½ |
| | L. F. Rothschild & Co., New York | 22,900 | 27½ | 30¼ |
| Nov. 28 | Thanksgiving Day, stock exchanges closed. | | | |
| | Bache & Co., New York | 1,400 | | 29¾ |
| Nov. 29 | Goldman Sachs & Co., New York | 9,900 | 29½ | 30½ |
| | L. F. Rothschild & Co., New York | 17,050 | 29½ | 30½ |

For the period November 26, 1968, through November 29, 1968, the Loew's 6⅞-percent subordinated debentures due 1993 $100 principal amount traded on a "when issued" basis on the over-the-counter market with actual purchase and sale transactions in the volume and for the prices set forth in the following summary:

| Date | Broker reporting | Dollar volume | Low price | High price |
|---|---|---|---|---|
| Nov. 26 | Brukenfeld Mitchell & Co., New York | $5,000 | | $84 |
| | Goldman Sachs & Co., New York | 400,000 | $82¾ | 84⅝ |
| | L. F. Rothschild & Co., New York | 370,000 | 83½ | 85 |
| Nov. 27 | Bache & Co., New York | 6,200 | | 81½ |
| | Brukenfeld Mitchell & Co., New York | 659,600 | 81 | 83¼ |
| | Goldman Sachs & Co., New York | 1,370,000 | 81 | 83¼ |
| | L. F. Rothschild & Co., New York | 409,100 | 79½ | 83¼ |
| Nov. 28 | Thanksgiving Day, stock exchanges closed. | | | |
| Nov. 29 | Goldman Sachs & Co., New York | 3,150,000 | 80 | 81 |
| | L. F. Rothschild & Co., New York | 5,100,000 | 80 | 81¼ |
| | Brukenfeld Mitchell & Co., New York | 539,000 | 80 | 81½ |

The price quotations noted above for over-the-counter transactions in the "when issued" Loew's securities do not represent the entire market for such securities but merely the sales reported by several major brokerage houses.

The Loew's 6⅞-percent subordinated debentures due 1993 traded on a "when issued" dealing on the New York Stock Exchange on December 2, 1968, at an average high-low price of $80.875 for a $100 principal amount.

On November 29, 1968, Lorillard common stock traded on the New York Stock Exchange at an average high-low price of $79.125 per share.

During the period from December 16 through December 31, 1968, the Loew's warrants traded on the American Stock Exchange on a "when issued" dealing with a price range of a low of $30 to a high of $35.75. The closing price on Loew's warrants "when issued" on December 31, 1968, was $32.75. By December 1969 the Loew's warrants were selling for a high-low average of $15.56.

From December 2, 1968, when Loew's 6⅞-percent subordinated debentures due 1993 were admitted to the New York Stock Exchange for "when issued" trading, through December 31, 1968, the price ranged from a low of $78.375 to a high of $81.25.

Loew's common stock split 3 for 1 effective with the merger on November 29, 1968.

As a result of the Loew's-Lorillard merger, Loew's issued $401,676,734 principal amount of 6⅞-percent subordinated debentures due 1993 and 6,478,657 warrants.

OPINION

Petitioner owned 4,000 shares of Lorillard stock for more than 6 months prior to November 26, 1968. On that date at a special meeting of the Lorillard shareholders an agreement was reached whereby Lorillard would be merged into a subsidiary of Loew's effective at the close of business on November 29, 1968. As a result of the merger each share of Lorillard automatically became a $62 subordinated 25-year debenture of Loew's and a warrant to purchase 1 share of Loew's common stock at specified prices for 12 years. The parties have agreed that the merger is to be treated as a taxable sale occurring on November 29, 1968, in which petitioner exchanged its 4,000 shares of Lorillard for $248,000 principal amount of Loew's debentures and 4,000 Loew's warrants.[3]

Petitioner claims that the sale of its Lorillard stock may be reported on the installment method under section 453. On the other hand respondent contends that the installment method is not available to petitioner by virtue of section 453(b)(2) because petitioner received a payment in the year of sale exceeding 30 percent of the selling price of the stock.

We note that the transaction under consideration occurred prior to the amendment of section 453 by the addition of subsection (b)(3). Accordingly, the debentures received by petitioner are to be treated as evidences of indebtedness rather than property for the purpose of determining whether the installment method can be used. In addition, there is little dispute between the parties concerning the fair market value of these debentures. The record amply supports respondent's determination that these debentures were worth 80 percent of their face amount on November 29, 1968, and we hold that they were worth such amount at that time. Therefore, the only fact contested by the parties is the valuation of the Loew's warrants on November 29, 1968.

Respondent determined that the warrants were worth $29.375 each on the date of sale, and tested the transaction against section 453(b)(2) in the following manner:

```
$248,000 face amount debentures at 80 percent_____ $198, 400
4,000 warrants at $29.375_____ 117, 500
                                                          _____
    Total price_____  315, 900
    Warrants=1175/3159=37 percent of total price
```

Regardless of the value of the warrants, respondent's application of the statute is erroneous in one respect. Section 453(b)(2) requires

---

[3] Petitioner has abandoned any argument that its gain should be recognized in 1969, the year in which it physically received the Loew's debentures and warrants.

that the payments in the year of the sale not exceed 30 percent of the selling price. The selling price is the total amount that the purchaser agrees to pay, and evidences of indebtedness are counted at their face amount rather than their market value as respondent has done. Accordingly, petitioner could have received cash or other property worth $106,280 as a downpayment without violating section 453(b)(2) as shown below:

| | |
|---|---|
| Debentures at face amount | $248, 000 |
| 4,000 warrants at $26.57 | 106, 280 |
| Selling price | 354, 280 |

Warrants=10628/35428=29.99 percent of selling price

Despite the error in respondent's method of applying section 453(b)(2) we believe that petitioner's task of showing that it received less than 30 percent of the selling price as a downpayment in warrants is insurmountable on the record before us. Respondent's determination that the fair market value of the warrants was $29.375 each is supported by evidence of market transactions on a "when issued" basis beginning on November 26, 1968, and continuing through December 31, 1968. The "when issued" warrants were traded during this period in substantial numbers first in the over-the-counter market and later on the American Stock Exchange. Accordingly, we believe that for at least a month after the effective date of the merger petitioner could have entered into a contract to sell its warrants for at least $29.375 per warrant.

Despite the fact that petitioner's warrants were actively traded on a "when issued" basis on November 29, 1968, petitioner claims that the market price for such warrants is not representative of the "fair value." Petitioner's expert witness testified that, in general, stock prices were inflated toward the end of 1968, that the announcement of the Lorillard-Loew's merger fueled speculation in their securities, and that the market prices for the securities involved in the merger represented unrealistically high price-earnings ratios. Based upon his analysis of the anticipated earnings of the merged company the expert opined that the warrants had a true worth or investment value, which he denominated a "fair value," of $9 to $12 per warrant. Other evidence presented by petitioner indicated a "fair value" of less than $20 per warrant.

The testimony of petitioner's expert and its other evidence were all very interesting, but petitioner missed the point of our inquiry in this case. The crux of petitioner's case is that the traders in the market who were willing to pay over $29 for a Loew's warrant were either speculating, misinformed, or foolish. We might well agree that there

is a great deal of truth in this contention because we know that the bottom fell out of the market for the warrants in the latter part of 1969, but the fact remains that there was a market for petitioner's warrants at over $29 apiece at the time it received them. Petitioner has presented no evidence to indicate that it would have been entitled to less than market price for its warrants had it chosen to sell them at that time.

To adopt the "fair value" standard urged by petitioner would require us to ignore substantial and frequent market transactions whenever market prices for securities did not accord with an analyst's estimate of their true or intrinsic worth. In our view a bull or bear market is nevertheless a fair auction market which sets the price for traded securities.

We agree with petitioner that we must consider all facts and circumstances in determining the value of property and that some cases have disregarded evidence of market transactions in favor of other evidence of value; however, this case lacks the circumstances peculiar to those cases. See *Moore-McCormack Lines, Inc.*, 44 T.C. 745 (1965) ; *Heiner* v. *Crosby*, 24 F. 2d 191 (C.A. 3, 1928) ; *Central Trust Co.* v. *United States*, 305 F. 2d 393 (Ct. Cl. 1962). The present case is not at all analogous to *Moore-McCormack Lines, Inc.*, *supra*, as petitioner suggests. In *Moore-McCormack Lines, Inc.*, we held that evidence of a small number of market transactions was not indicative of the value of a large block of stock received by petitioner in a private transaction. Petitioner argues that the market transactions relied upon by respondent involved relatively small numbers of Loew's warrants when compared to the more than 6 million which were issued as a part of the Loew's-Lorillard merger and that the price obtaining in these transactions cannot be indicative of the value of the whole issue of warrants. Petitioner urges that we should consider what would happen to the price of Loew's warrants if all 6 million were offered for sale at one time. His argument for use of the blockage rule is that Loew's gave the warrants in a block and they should be valued as a block.

In our view the blockage rule is not applicable to the present case. To begin with, section 453(b)(2)(A)(ii) looks to payments received by a seller and in this case petitioner received 4,000 warrants, not 6 million. Next, in determining whether the blockage rule is applicable, distinct transactions are not lumped together, but are considered separately. *William J. Rushton*, 60 T.C. 272 (1973). In the instant case, there was not one exchange but numerous separate transactions in which the Lorillard shareholders exchanged their Lorillard stock for Loew's debentures and warrants.

Furthermore, the Loew's-Lorillard merger was not a private trans-

action but a public one well advertised in the market. Loew's publicly offered to accept the over 6 million outstanding shares of Lorillard stock in exchange for like amounts of its debentures and warrants. Accordingly, we need not consider the hypothetical effects of selling 6 million Loew's warrants at one time because 6 million Loew's warrants were in fact traded at one time on November 29, 1968.[4] The market reacted favorably and, despite the fact that there were 6 million more warrants outstanding, the price for them remained strong at least until the end of 1968.

Finally, it is implicit in petitioner's position that a simulated second distribution is pertinent to this case.[5] Recently, we considered a similar assertion in *White Farm Equipment Co.*, 61 T.C. 189 (1973), and found it inappropriate to the facts of that case. Similarly, we think it is inapplicable in the present case for reasons previously discussed.

We are convinced from the record as a whole that respondent's determination that the Loew's warrants had a fair market value of $29.375 each on November 29, 1968, is based upon substantial and adequate evidence of market transactions and should be sustained.

Reviewed by the Court.

*Decision will be entered under Rule 155.*

---

[4] See Porter, "The Cost Basis of Property Acquired By Issuing Stock," 27 Tax Lawyer 279, 293 (1974).

[5] See Chisum, "A Reconstruction of Taxation's Blockage Doctrine," 20 Stanford L. Rev. 336, 338 (1967–68).